**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| T&K ASSOCIATES, LLC | ) |
| | ) |
| | ) |
| | ) |
| | ) Civil Action No._____ |
| Plaintiff, | ) |
| v. | ) |
| | ) |
| UNITED STATES OF AMERICA | ) |
| | ) |
| Defendant. | ) |
| | / |

## COMPLAINT FOR JUDICIAL REVIEW OF FINAL AGENCY DECISION

Plaintiff T&K Associates, LLC ("T&K" or "Store"), by and through undersigned counsel, pursuant to 7 U.S.C. §2023 and 7 C.F.R. §279.7, hereby files this Complaint against Defendant United States and alleges:

1.     This action seeks judicial review of the Final Agency Decisions ("FAD" or collectively "FADs"), dated May 7, 2019, issued by USDA's Food and Nutrition Service ("FNS"), affirming the withdrawal of the authorizations of two (2) stores owned by T&K to participate as authorized retailers in the Supplemental Nutrition Assistance Program ("SNAP").

**PARTIES**

2.     Plaintiff T&K is a Georgia limited liability company with its principal place of business in this judicial district.

3.     Plaintiff T&K does business as T&K Discount Meats & Seafood (T&K #1), a retail food store that predominantly sells chicken, fish, and other seafood products at its location in a deeply impoverished neighborhood in Jonesboro, Georgia.

4.     Plaintiff T&K does also business as T&K Discount Meats #2 (T&K #2), a retail food store that predominantly sells chicken, fish, and other seafood products at its location in a deeply impoverished neighborhood in Morrow, Georgia.

5.     Each Store is a "Retail Food Store" as such term is defined in 7 C.F.R. §271.2.

6.     Defendant United States of America is the federal government.

7.     United States Department of Agriculture ("USDA") is an executive branch department of the federal government.

8.     FNS is an agency of the USDA.

9.     FNS administers and has promulgated regulations governing SNAP pursuant to powers delegated by Congress in Section 4 of the Food and Nutrition Act of 2008.  7 U.S.C. §2013.

## JURISDICTION AND VENUE

10.    This Court has subject matter jurisdiction over this *de novo* judicial review action of FNS's FADs pursuant to 7 U.S.C. §2023, 7 C.F.R. §279.7, and 28 U.S.C. §§1331, 1346.

11.    This Court has personal jurisdiction over the parties pursuant to 7 U.S.C. §2023.

12.    This Court has jurisdiction to grant declaratory and further necessary and proper relief pursuant to Federal Rules of Civil Procedure 57 and 65.

13.    Venue in this district is proper under 7 U.S.C. §2023 and 28 U.S.C. §§1391(b) and (e) because both T&K stores are located in Georgia within this judicial district.  Venue is also proper because the United States of America is deemed a resident of this judicial district and has consented to suit in this judicial district in SNAP judicial review proceedings.  7 U.S.C. §2023(a)(13).

14.    T&K has exhausted any and all administrative remedies required prior to the institution of this action.

## SNAP

15.    Formerly known as the food stamp program, SNAP provides supplemental nutrition benefits to more than 40 million Americans and more than

1.5 million Georgians.  More than 25% of the households in Clayton County are SNAP beneficiaries.

16.     SNAP's fundamental purpose is to provide eligible low-income households with increased food purchasing power. 7 U.S.C. §2011.

17.     Pursuant to SNAP regulations set forth in Part 278 of Title 7 of the Code of Federal Regulations, FNS has authority to authorize and disqualify retail food stores from participation in SNAP.

## FACTUAL ALLEGATIONS

18.     Each T&K store is a retail food store that specializes in raw chicken, fish, and seafood items.

19.     T&K #1 opened for business in approximately 2004 and received its SNAP (formerly the food stamp program) authorization shortly thereafter.

20.     T&K #2 opened for business in approximately 2008 and received its SNAP (formerly the food stamp program) authorization shortly thereafter.

21.     At all times relevant hereto, each T&K store is and has been authorized by FNS to participate in SNAP as an authorized retailer.

22.     At all times relevant hereto, each T&K store has trained its employees regarding SNAP in accordance with FNS requirements.

23.     At all times relevant hereto, each T&K store has properly supervised its employees, including regarding SNAP transactions and program requirements.

24.     The overwhelming majority of gross receipts at each T&K store are from the sale of SNAP-eligible staple food items.

25.     On or about November 16, 2017, FNS sent an application for SNAP reauthorization letter to each T&K store requesting that it complete FNS Form 252-R. ("Request for Records").

26.     Each Request for Records requested the following records:

- Verification of total gross retail sales for the last 3 months;

- Verification of actual sales for the last 3 months (actual sales receipts, etc.);

- A summary of actual sales for the last 3 months (for example, including total dollar amount of sales, separated into the following categories: 1) heated or prepared foods, 2) non-foods, 3) accessory foods, 4) staple foods, and 5) charges for food heating services;

- Supply and inventory records (purchased orders, delivery receipts for suppliers/wholesaler, inventory logs, etc.); and

- Business licenses.

27.     On December 15, 2017, each T&K store fully responded to the Request for Records and submitted all of the documentation requested by FNS in the Request for Records that it possessed, including its menu mix reports.

28.     Each T&K store's response to the Request for Records denied that it was a restaurant.

29.     On December 18, 2017, the date after T&K submitted its responses to the Request for Records, FNS withdrew both store's SNAP authorizations ("Withdrawal Letter")

30.     The stated reason for FNS's withdrawal of both store's SNAP authorizations was that "We have not received the updated information requested" in the Request for Records.

31.     The Withdrawal Letter noted that the withdrawal would be effective unless "you immediately provide the required information to the Food and Nutrition Service."

32.     On December 29, 2017, each T&K store timely submitted supplemental responses to FNS in response to the Withdrawal Letter.

33.     T&K's December 29, 2017, supplemental responses to the Withdrawal Letter noted that it did not know what information FNS contended was missing and submitted numerous customer declarations and cashier customer purchase record

sheets and further noted that no federal or state law or regulation directed or required SNAP retailers to maintain sales register receipts.

34. T&K's responses noted that each did not utilize a sophisticated point-of-sale (POS) system similar to the type used at large retailers.

35. T&K's responses noted that each store's register receipts provide no indication regarding whether the customer intends to eat the food at home or at another location.

36. T&K's responses provided a percentage of gross sales for each of the five requested categories: heated/prepared foods, non-foods, accessory foods, staple foods, and heating charges.

37. More than 50% of the gross receipts at each T&K store during the three month period set forth in the Request for Records reflected sales of foods that were neither cooked nor heated onsite (pre-sale or post-sale) nor prepared foods.

38. T&K's responses noted that FNS has no authority under its regulations to withdraw the authorization of a SNAP retailer unless evidence exists that establishes that a majority of a retailer's gross sales exceeds the sum of: (1) foods cooked or heated on-site by the retailer before or after purchase; and (2) hot or cold prepared food not intended for home preparation or consumption.

39. T&K's responses stated, among other things, that FNS has never required SNAP retailers to use sophisticated point-of-sale equipment that provide a

high level of detail on each register receipt, that FNS was improperly shifting the burden of proof onto retailers to show that they were not a restaurant, and that any agency decision that imposes a *de facto* requirement of providing detailed register receipts as a condition of authorization without going through the notice and comment rulemaking process would violate the Administrative Procedure Act.

40.   On or about January 9, 2019, both of T&K stores' SNAP terminals stopped working after FNS advised its vendor and/or T&K's third party processor that those stores were no longer authorized to participate in SNAP.

41.   Prior to effectuating the withdrawal, FNS failed to provide written notice to each T&K store that its SNAP authorization was still being withdrawn following its submission of supplemental records in response to the Withdrawal Letter.

42.   On December 9, 2019, T&K's counsel wrote to FNS Section Chief Mike Pace inquiring why each store's SNAP terminal was no longer operational.

43.   The same day, Mr. Pace replied that each T&K store failed to provide verification of actual sales for the last 3 months (actual sales receipts, etc.) and failed to provide a summary of actual sales for the last 3 months (for example, including total dollar amount of sales, separated into the following categories: 1) heated or prepared foods, 2) non-foods, 3) accessory foods, 4) staple foods, and 5) charges for food heating services.

44.     On January 9, 2018, each T&K store timely submitted its request for administrative review of FNS's withdrawal of its SNAP authorization, pursuant to 7 C.F.R. Part 279.

45.     On April 26, 2019, each T&K store submitted its response in support of its Requests for Administrative Review.

46.     On May 8, 2019, FNS Administrative Review Officer Jon Yorgason issued Final Agency Decisions ("FADs") relating to each T&K store's Request for Administrative Review. Copies of each FAD are attached hereto as Exhibit A and B.

47.     In its FADs, FNS affirmed the withdrawal of each T&K store's SNAP authorization because it "did not submit cash register receipts as requested." FAD, at 14.

48.     The FADs noted that the "purpose of this review is to either validate or invalidate the earlier determination of the Retailer Operations Division." *Id.*  They also stated that "[t]his review is limited to consideration of the relevant facts as they existed at the time the Retailer Operations Division rendered its withdrawal decision." *Id.*

49.     The FADs asserted that "a firm must make business decisions whether or not to maintain any records or employ the use of a point-of-sale system that would help prove its eligibility for program participation." *Id.* at 16.

50.    The FADs relied heavily upon a short contractor's visit to each Store, which took place long before FNS withdrew each Store's SNAP authorization. *Id.* at 14, 16.

51.    The FADs concluded that "[i]f a firm's eligibility cannot be determined, it cannot remain authorized." *Id.*

52.    The FADs also noted that FNS "routinely requests documented sales evidence, including cash register receipts" but admitted that "it is true that FNS does not require SNAP retailers to maintain records, including detailed cash register receipts; nor does it require that a firm install sophisticated point-of-sale systems." *Id.* at 16.

53.    The FADs were also premised heavily upon on "the change in regulation which altered the definition of restaurant." *Id.* at 15.

54.    The FADs relied upon RPMD Policy Memorandum 2017-01, which has since been revised and which was not in effect until the end of the three month period set forth in the Request for Records.

55.    The FADs concluded that the declaration submitted by Kason Nash and store customers were unpersuasive because they were not accompanied by "supporting evidence of individual sales transactions." *Id.*

56.    The FADs were based on each T&K store's failure to submit "any additional sales documents beyond what had already been provided to the Retailer Operations Division." *Id.* at 18.

57.    The FADs were improperly based on the lack of "compelling evidence" submitted by each T&K store that established that sales of hot and/or cold prepared foods "were below the 50 percent restaurant threshold."

## COUNT I - JUDICIAL REVIEW OF FINAL AGENCY ACTION PURSUANT TO 7 U.S.C. §2023 AND 7 C.F.R. §279

58.    Plaintiff T&K repeats and re-alleges paragraphs 1 through 57 as if fully set forth herein.

59.    At all times relevant hereto, a majority of each T&K store's gross receipts were of staple food items that were neither cooked nor heated on-site (pre-sale or post-sale) nor were prepared foods.

60.    Each T&K store's response to the Requests for Records and Withdrawal Letters established that a majority of its gross receipts were neither cooked nor heated on-site (pre-sale or post-sale) nor were prepared foods.

61.    The declaration of Kason Nash established that a majority of each T&K store's gross receipts during the period requested by FNS were of staple food items

that were neither cooked nor heated on-site (pre-sale or post-sale) nor were prepared foods.

62.    The declarations of each store's customers established that they purchased eligible food items at T&K items that were neither cooked nor heated on-site (pre-sale or post-sale) and consumed such items at home.

63.    At no time has FNS promulgated a regulation that requires SNAP-authorized retailers to keep register receipts from SNAP transactions.

64.    At no time has FNS promulgated a regulation that requires SNAP-authorized retailers to keep register receipts from non-SNAP transactions.

65.    At no time has FNS promulgated a formal policy memorandum that requires SNAP-authorized retailers to keep register receipts from SNAP transactions.

66.    At no time has FNS promulgated a formal policy memorandum that requires SNAP-authorized retailers to keep register receipts from non-SNAP transactions.

67.    No federal or state law or regulation required SNAP retailers to maintain register receipts during the three month period preceding the Request for Records.

68.    No regulation promulgated by FNS required SNAP retailers to maintain register receipts during the three month period preceding the Request for Records.

69.    FNS's SNAP Retailer Training Guide is not a regulation promulgated under the Administrative Procedure Act following public notice and an opportunity to comment.

70.    FNS's SNAP policy memoranda, including Policy Memorandum 2017-01 is not a regulation promulgated under the Administrative Procedure Act following public notice and an opportunity to comment.

71.    FNS's SNAP policy memoranda, including Policy Memorandum 2017-01, Rev. 1 is not a regulation promulgated under the Administrative Procedure Act following public notice and an opportunity to comment.

72.    At no time did FNS provide SNAP retailers with notice via e-mail or other direct communication that it amended its SNAP Retailer Training Guide during January 2018.

73.    At no time did FNS notify any T&K store that it amended its SNAP Retailer Training Guide during January 2018.

74.    At no time has FNS notified SNAP retailers with notice via e-mail or other direct communication that it issued Policy Memorandum 2017-01.

75.   At no time has FNS notified each T&K store that it had issued Policy Memorandum 2017-01.

76.   At no time has FNS notified SNAP retailers with notice via e-mail or other direct communication that it issued Policy Memorandum 2017-01, Rev. 1.

77.   At no time has FNS notified each T&K store that it had issued Policy Memorandum 2017-01, Rev. 1.

78.   FNS's SNAP Retailer Training Guide does not provide any specificity regarding the type of point-of-sale system that SNAP retailers should utilize.

79.   FNS's SNAP Retailer Training Guide does not provide any specificity regarding the type of register receipts that SNAP retailers should utilize.

80.   FNS's SNAP Retailer Training Guide does not provide any specificity regarding the information that should be provided on register receipts given to customers.

81.   FNS's SNAP Retailer Training Guide does not provide any specificity regarding the information that should be provided on register receipts that SNAP retailers should maintain.

82.   At no time has FNS published a notice or other alert on its website advising SNAP retailers that it amended its SNAP Retailer Training Guide during January 2018.

83.    At no time has FNS promulgated a regulation that requires SNAP-authorized retailers to keep register receipts that provide detail regarding foods cooked or heated on-site.

84.    At no time has FNS promulgated a regulation that requires SNAP-authorized retailers to keep register receipts that provide detail regarding foods cooked or heated on-site, pre-sale.

85.    At no time has FNS promulgated a regulation that requires SNAP-authorized retailers to keep register receipts that provide detail regarding foods cooked or heated on-site, post-sale.

86.    At no time has FNS promulgated a regulation that requires SNAP-authorized retailers to install a point-of-sale system to process SNAP transactions.

87.    At no time has FNS promulgated a regulation that advises SNAP-authorized retailers that their failure to install a sophisticated point-of-sale system to process SNAP transactions could result in the withdrawal of their SNAP authorization.

88.    At no time has FNS promulgated a regulation that advises SNAP-authorized retailers that their failure to keep register receipts could result in the withdrawal of their SNAP authorization.

89.    At no time has FNS promulgated a regulation published or issued a notice on its website or elsewhere that advises SNAP-authorized retailers that their

failure to install a sophisticated point-of-sale system to process SNAP transactions could result in the withdrawal of their SNAP authorization.

90.    At no time has FNS promulgated a regulation that requires SNAP-authorized retailers to install a sophisticated point-of-sale system similar to those used by many large retailers, including most SNAP-authorized superstores.

91.    No point-of-sale system in use by SNAP retailers differentiates between foods cooked or heated on-site and off-site.

92.     Neither FNS nor Plaintiff is aware of a point-of-sale system in use by SNAP retailers that differentiates between foods cooked or heated pre-sale and post-sale.

93.    FNS did not have a proper basis for withdrawing each T&K store's SNAP authorization.

94.    A preponderance of the evidence that FNS considered in issuing the FAD did not support its decision to withdraw each T&K store's SNAP authorization.

95.    FNS's Request for Records was issued before FNS amended its SNAP Retailer Training Guide.

96.    FNS's Request for Records requested records dated prior to FNS issuance of Policy Memorandum 2017-01.

97.    FNS's Request for Records requested records dated prior to FNS issuance of Policy Memorandum 2017-01, Rev. 1.

98.    FNS withdrew each T&K store's SNAP authorization because it failed to provide records it was not required by FNS to keep pursuant to a validly promulgated regulation.

99.    FNS withdrew each T&K store's SNAP authorization because it failed to provide records it was not required by FNS to keep pursuant to a publicly issued policy memorandum.

100.   FNS withdrew each T&K store's SNAP authorization because each failed to provide records that it never possessed.

101.   FNS withdrew each T&K store's SNAP authorization because each failed to provide records that contained information that never existed on any register receipts.

102.    FNS withdrew each T&K store's SNAP authorization because each failed to provide records that contained information that never existed on any records given to SNAP beneficiaries.

103.   FNS's withdrew each T&K store's SNAP authorization because each failed to provide records they no longer had in their possession.

104.   FNS's Policy Memorandum 2017-01 does not require SNAP retailers to keep register receipts.

105.   FNS's Policy Memorandum 2017-01, Rev. 1 does not require SNAP retailers to keep register receipts.

106.   FNS improperly shifted the burden of proof to each T&K store to disprove that it is a restaurant in violation of the Food and Nutrition Act and FNS's SNAP regulations.

107.   FNS's decision to withdraw each T&K store's SNAP authorization was invalid, unreasonable, arbitrary and capricious, and unsupported by the administrative record and all other evidence available to it.

108.   FNS's decision to withdraw each T&K store's SNAP authorization should be reversed because FNS failed to consider all evidence submitted by the Store.

109.   FNS's decision to withdraw each T&K store's SNAP authorization should be reversed because FNS required the store to submit "compelling evidence."

110.   FNS's decision to withdraw each T&K store's SNAP authorization should be reversed because FNS failed to consider the detailed information submitted in support of its request for administrative review.

111.   FNS's withdrawal of each T&K store's SNAP authorization was not rationally related to any legitimate governmental interest.

112.   FNS's withdrawal of each T&K store's SNAP authorization is inconsistent with Congressional intent in enacting the Food and Nutrition Act of 2008.

113.   FNS's withdrawal of each T&K store's SNAP authorization represents agency action beyond the scope of authority granted by Congress to FNS when it delegated power to promulgate and enforce reasonable regulations in the Food and Nutrition Act of 2008.

114.   FNS, in issuing the FADs, relied upon records and other information in FNS's possession which were never provided to each T&K store.

115.   FNS, in issuing the FADs, relied upon records and other information in FNS's possession that each T&K store had requested in their FOIA Requests.

116.   The FAD was not based upon any declarations or affidavits from a USDA or FNS official, employee, or contractor whose identity was disclosed to each T&K store.

117.   The FADs are FNS's final administrative determinations related to the withdrawal of each T&K store's SNAP authorization.

118.   The FAD is subject to judicial review and a trial *de novo* pursuant to 7 U.S.C. §§2023(a)(13), (15).

119.   Judicial reviews pursuant to 7 U.S.C. §§2023(a) are not governed by the Administrative Procedure Act and the evidence is not limited to the administrative record prepared by FNS.

120.   The FAD was based on an arbitrary and capricious interpretation of the Food and Nutrition Act of 2008 and FNS's SNAP regulations.

121.   FNS withdrew each T&K store's SNAP authorization in violation of the Food and Nutrition Act of 2008 and FNS's SNAP regulations.

122.   FNS's withdrawal of each T&K store's SNAP authorization was premised upon an erroneous, unsupportable, and arbitrary and capricious interpretation of 7 C.F.R. §278.1.

123.   In issuing the FADs, FNS acted arbitrarily and capriciously by failing to consider all information submitted by or related to each T&K store.

124.   Plaintiff respectfully requests a *de novo* review of FNS's FADs which affirmed the withdrawal of each T&K store's SNAP authorization.

WHEREFORE, Plaintiff respectfully requests that this Court, after conducting a *de novo* review of the FADs, enter judgment in its favor and against the United States, and issue an Order granting the following relief:

(a)   Reversing the FADs;

(b)   Vacating FNS's Initial Determinations;

(c)   Preliminarily enjoining FNS from withdrawing each T&K store's authorization to participate in SNAP during the pendency of this action;

(d)   Permanently enjoining FNS from withdrawing each T&K store's authorization to participate in SNAP based upon the Initial Determinations and/or the FADs;

(e)     Awarding each T&K store an amount equal to its reasonable attorneys'

fees and costs, including pursuant to the Equal Access to Justice Act; and

(f)     Such other and further relief as the Court may deem just and proper.


Respectfully submitted this 4th day of June 2019.


By:     /s/ Esther Panitch
        Esther Panitch
        Georgia Bar No. 143197
        The Panitch Law Group, P.C.
        315 West Ponce de Leon
        Suite 1070
        Decatur, GA 30030
        (770) 364-6952 – Telephone
        (678) 865-8106 – Facsimile
        esther@panitchlawgroup.com

        Stewart D. Fried (*pro hac vice application forthcoming*)
        Olsson Frank Weeda Terman Matz PC
        2000 Pennsylvania Avenue, N.W., # 3000
        Washington, D.C. 20006
        (202) 518-6326 – Telephone
        (202) 747-3140 – Facsimile
        sfried@ofwlaw.com

        Attorneys for Plaintiff