IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

T&K Associates, LLC,

               Plaintiff,

v.                               Case No. 1:19-cv-2559-MLB

United States of America,

               Defendant.

_____/

## OPINION & ORDER

Plaintiff T&K Associates, LLC ("T&K") brings this action against Defendant United States of America seeking judicial review—under 7 U.S.C. § 2023(a)(13) and 7 C.F.R. § 279.7—of the United States Department of Agriculture's ("USDA") Food and Nutrition Service's ("FNS") Final Agency Decision ("FAD") from its Administrative Review Officer ("ARO") affirming a decision by the Retail Operations Division ("ROD") regarding the withdrawal of Plaintiff's Supplemental Nutrition Assistance Program ("SNAP") authorization.  Plaintiff contends FNS's determination Plaintiff failed to cooperate with the reauthorization process was invalid.  Both parties move for summary judgment.  (Dkts.

61; 63.)   The Court grants Defendant's motion and denies Plaintiff's motion.

## I.     Background

### A.     Supplemental Nutrition Assistance Program

SNAP is a federal program authorized by 7 U.S.C. § 2011, et seq., whose purpose is to "permit low-income households to obtain a more nutritious diet through normal channels of trade by increasing food purchasing power for all eligible households who apply for participation." (Dkts. 61-1 ¶ 1; 69 ¶ 1; 70-2 ¶ 1; 74 ¶ 1 (quoting 7 U.S.C. § 2011).)   SNAP households get an electronic benefits card to buy eligible food at participating stores.   (Dkts. 61-1 ¶ 3; 69 ¶ 3; 61-5 at 1; 70-2 ¶ 2; 74 ¶ 2.) Those stores must provide point-of-sale equipment that accepts SNAP benefit cards.   (Dkts. 61-1 ¶ 4; 69 ¶ 4; 70-2 ¶ 3; 74 ¶ 3.)   The Food and Nutrition Act of 2008 does not require SNAP retailers to install any specific point-of-sale system and FNS has never promulgated a regulation requiring SNAP retailers to maintain a specific system.   (Dkts. 64 ¶¶ 14–17; 70-1 ¶¶ 15–18.)   The Act only specifies minimum requirements for point-of-sale equipment.   *See* 7 U.S.C. 2018(g).

The Secretary of the USDA administers SNAP and promulgates regulations to do so, including regulations governing the authorization of retail food stores wanting to be a part of SNAP. (Dkts. 61-1 ¶ 2; 69 ¶ 2.) The Secretary has delegated that authority to FNS. (Dkts. 61-1 ¶ 2; 69 ¶ 2; 64 ¶¶ 1–3; 70-1 ¶¶ 1–3.) One regulation states that "[a]ny firm desiring to participate or continue to be authorized in the program shall file an application as prescribed by FNS." *See* 7 C.F.R. § 278.1(a).[1] It further states that "[s]uch an application shall contain information which will permit a determination to be made as to whether such an applicant qualifies, or continues to qualify, for authorization under the provisions of the program." *Id.* An applicant must "provide sufficient data and information on the nature and scope of the firm's business for FNS to determine whether the applicant's participation will further the purposes of the program." *Id.* § 278.1(b). A firm's eligibility determination is made by, among other things, "visual inspection, sales records, purchase records, counting of stockkeeping units, or other inventory or accounting recordkeeping methods that are customary or reasonable in the retail food industry." 7 U.S.C. § 2012(o); 7 C.F.R. 278.1(b)(1)(i)(B).

3

At any time, FNS may require a retail food store to undergo a periodic reauthorization. (Dkts. 61-1 ¶ 13; 69 ¶ 19; 70-2 ¶ 13; 74 ¶ 13.) A reauthorization request is subject to the same application process as an initial application. (Dkts. 61-1 ¶ 14; 69 ¶ 20.)[1] FNS must withdraw a firm's authorization to participate in SNAP if the firm fails to cooperate in the reauthorization process.[2] (Dkts. 61-1 ¶ 15; 69 ¶ 21.)[3]

To be eligible for authorization or reauthorization, a retail store must show that it is

> an establishment, house-to-house trade route, or online entity that sells food for home preparation and consumption and—
>
> (A) offers for sale, on a continuous basis, a variety of at least 7 foods in each of the 4 categories of staple foods specified in subsection (q)(1), including perishable foods in at least 3 of the categories; or
>
> (B) has over 50 percent of the total sales of the establishment or route in staple foods,

7 U.S.C. § 2012(o)(1)(A)–(B). To qualify under Criterion B, firms must have more than fifty percent of their total gross retail sales in staple

---

[1] The Court cites to Plaintiff's first paragraph "20."

SNAP regulations refer to participating retail foods stores as "firms." 7 C.F.R. § 271.2. The Court uses "firm," "retailer," and "store" interchangeably to identify a food store participating or applying to participate in SNAP.

[3] The Court cites to Plaintiff's first paragraph "21."

foods.  7 C.F.R. § 278.1(b)(1)(iii).  Staple foods include meat, poultry, or fish; bread or cereals; vegetables or fruits; and dairy products.  7 U.S.C. § 2012(q).  Alcoholic beverages, tobacco, hot foods or hot food products ready for immediate consumption" are not considered staple foods.  (Dkts. 61-1 ¶ 17; 69 ¶ 23.)[4]

Restaurants are generally ineligible to participate in SNAP.  (Dkts. 64 ¶ 5; 70-1 ¶ 5; 70-2 ¶ 19; 74 ¶ 19.)  FNS enacted a so-called "Restaurant Threshold" regulation that classifies firms as restaurants if their sales of non-qualifying items exceed certain limits.  (Dkt. 61-7 (USAD Policy Memorandum, Retailer Eligibility—Restaurants).)  Before January 17, 2017, the Restaurant Threshold regulation focused on the sale of hot or cold "ready-to-eat" foods intended for immediate consumption, that is, on take-out meals.  The regulation provided that:

> Entities that have more than 50 percent of their total gross retail sales in hot and/or cold prepared, ready-to-eat foods that are intended for immediate consumption either for carry-out or on-premises consumption, and require no additional preparation, are not eligible for SNAP participation as retail food stores under § 278.1(b)(1) of this chapter.

---

[4] The Court cites to Plaintiff's first paragraph "23."

See 7 C.F.R. § 271.2. (Dkts. 61-1 ¶ 20; 69 ¶ 20;5 70-2 ¶ 20; 74 ¶ 20.) By its terms, the regulation did not address firms that sold food cold and then immediately cooked or heated the food for its customers.  So, FNS changed the regulation as of December 15, 2016 specifically to address the loophole exploited by these "you-buy-we-fry" restaurants.  FNS did this by adding "foods cooked or heated on-site by the firm before or after purchase" to the type of foods that must be counted in determining whether a firm exceeds the Restaurant Threshold.  In total, the changed regulation states:

> Entities that have more than 50 percent of their gross retail sales in: [f]ood cooked or heated on-site by the retailer before or after purchase; and hot and/or cold prepared foods not intended for home preparation and consumption, including prepared foods that are consumed on the premises or sold for carry-out are not eligible for SNAP participation.

(Dkts. 61-1 ¶ 22; 69 ¶ 22;6 70-2 ¶ 22; 74 ¶ 22.)  Again "the intent of the [change] was to correct shortcomings in the existing regulatory language that [had] allowed for the authorization of . . . 'you-buy-we-fry'-style restaurants and pizza restaurants."  (Dkt. 61-8 at 9.)

---

5 The Court cites to Plaintiff's second paragraph "20."
6 The Court cites to Plaintiff's second paragraph "22."

### B.   Plaintiff's Store and SNAP Authorization

Plaintiff operates as a meat/seafood market that does business as T & K Discount Meats & Seafood.[7]  (Dkts. 61-1 ¶ 23; 69 ¶ 23;[8] 70-2 ¶ 23; 74 ¶ 23.)  At the market, a SNAP customer can buy raw meat using SNAP benefits and pay a separate cooking fee for Plaintiff to cook the meat. (Dkts. 61-1 ¶ 25; 69 ¶ 25;[9] 70-2 ¶ 25; 74 ¶ 25.)  Plaintiff has a posted menu of cooked food offerings, including wings, chicken and waffles, (various) fish, gator, and other meat, as well as sides and drinks.  (Dkts. 61-1 ¶ 26; 69 ¶ 26; 70-2 ¶ 26; 74 ¶ 26.)

On  early  November  2017,  an  FNS  contractor  visited  Plaintiff's market.[10]  (Dkts. 61-1 ¶ 36; 69 ¶ 36; 64 ¶ 30; 70-1 ¶ 31; 70-2 ¶ 42; 74 ¶

---

[7] When Plaintiff filed its complaint, it operated a second location, but that store was closed, and its withdrawal is no longer an issue in this case. (Dkts. 61-1 ¶ 24; 69 ¶ 24.)

[8] The Court cites to Plaintiff's second paragraph "23."

[9] The Court cites to Plaintiff's second paragraph "25."

[10]  In May 2015, FNS required Plaintiff's second store to apply for reauthorization  and  requested  the  store's  May  2015  "cash  register receipts that CLEARLY differentiate hot food sales and staple food sales."  (Dkts. 61-1 ¶ 27; 69 ¶ 27; 70-2 ¶ 27; 74 ¶ 27.)  On September 10, 2015, FNS requested the second store's "July 2015 and August 2015 sales register receipts that CLEARLY differentiate hot food sales and staple food sales."  (Dkts. 61-1 ¶ 28; 69 ¶ 28; 70-2 ¶ 29; 74 ¶ 29.)  On September 30, 2015, FNS denied the second store's application, but on April 19, 2016 it was reauthorized.  (Dkts. 61-1 ¶¶ 31, 35; 69 ¶¶ 31, 35.)  This store is now closed.

42.)  FNS notified Plaintiff of that visit by letter dated November 16, 2017.  (Dkt. 14-4 at 234.)  FNS also expressed its concern that Plaintiff was "operating primarily as a restaurant, in that more than 50 percent of [its] food sales are hot food (heated by [Plaintiff] before or after purchase) and or cold prepared food." (*Id*.)  FNS notified Plaintiff that it had placed Plaintiff under review for reauthorization, requiring Plaintiff to provide records sufficient to determine its eligibility for SNAP participation.  (*Id*.)  The letter required Plaintiff to produce a list of documents, including documents to verify Plaintiff's actual sales for three months and documents showing sales for three months in five categories: heated or prepared foods, non-foods, accessory foods, staple foods, and charges for food heating services.  (Dkts. 61-1 ¶ 37; 69 ¶ 37; 64 ¶ 31; 70-1 ¶ 32; 70-2 ¶¶ 43–45; 74 ¶¶ 43–45.)

On November 18, 2017, Plaintiff submitted an application for reauthorization signed by Kason Nash, Plaintiff's owner.  (Dkts. 61-1 ¶ 40; 69 ¶ 40; 70-2 ¶ 46; 74 ¶ 46.)  Plaintiff reported that 53.42% of its sales was from staple foods, 3.01% was from accessory foods, and 43.57% was from non-food items or food that is hot when the customer pays for it.  (Dkts. 61-1 ¶ 41; 69 ¶ 41; 70-2 ¶ 47; 74 ¶ 47.)

On December 15, 2017, Plaintiff submitted documents in response to FNS's November 16 request. (Dkts. 61-1 ¶ 42; 69 ¶ 42; 64 ¶ 34; 70-1 ¶ 35; 70-2 ¶ 48; 74 ¶ 48.)  In a letter accompanying those documents, Plaintiff stated, "several categories of records simply do not exist and cannot be produced or created given the current programming of its registers," and, in particular, that Plaintiff does not maintain register receipts. (Dkts. 61-1 ¶ 43; 69 ¶ 43; 70-2 ¶ 49; 74 ¶ 49.)  But Plaintiff's counsel included "records in [Plaintiff's] possession responsive to the FNS Request for Records." (Dkts. 61-1 ¶ 44; 69 ¶ 44; 70-2 ¶ 50; 74 ¶ 50.)  The documents included correspondence with FNS, Georgia Sales and Use Tax Returns, a menu mix report, business licenses, and inventory purchase records. (Dkts. 61-1 ¶ 45; 69 ¶ 45; 64 ¶ 35; 70-1 ¶ 36; 70-2 ¶ 51; 74 ¶ 51.)  Counsel explained

- The menu mix report does not differentiate between foods sold cold or hot and does not identify foods sold cold that are heated or cooked post-sale.

- Plaintiff does not maintain any reports that would identify sales in the requested categories.

- As for foods heated pre-sale or post-sale, Plaintiff cannot precisely determine those sales, but Mr. Nash estimates the sale of food heated pre- or post-sale consist of 35% of its total gross sales.

- Plaintiff sells relatively few non-food items and Mr. Nash estimates the sales consist of less than 10% of total gross sales.

- Plaintiff cannot precisely determine sales of accessory foods, but Mr. Nash estimates the sales consist of about 10% of the total gross sales.

- Plaintiff cannot precisely determine sales of staple foods, but Mr. Nash estimates those sales consist of more than 80% of total gross sales.

- Plaintiff cannot precisely determine charges for food heating services, but Mr. Nash estimates the charges were about $1,800.

(Dkts. 61-1 ¶ 46; 69 ¶ 46; 70-2 ¶ 52; 74 ¶ 52.)

On December 18, 2017, FNS's ROD issued a determination letter to Plaintiff advising that its SNAP authorization was being withdrawn. (Dkts. 61-1 ¶ 47; 69 ¶ 47; 64 ¶ 37; 70-1 ¶ 38; 70-2 ¶ 53; 74 ¶ 53.)  The ROD advised the withdrawal was in accordance with 7 C.F.R. § 278.1(n). (Dkts. 61-1 ¶ 48; 69 ¶ 48; 70-2 ¶ 54; 74 ¶ 54.)  The letter explained FNS was taking that action because Plaintiff had failed to provide the "updated information requested."  (Dkt. 14-6 at 50.)  FNS also advised Plaintiff that the withdrawal would be effective ten days from December 18 unless Plaintiff immediately provided the required information.  (*Id.*)

On December 29, 2017, Plaintiff responded with a declaration from Mr. Nash and several customers.  (Dkts. 14-6 at 54–56; 64 ¶ 38; 70-1 ¶ 39.)  On January 9, 2018, FNS Section Chief Michael Pace emailed Plaintiff's counsel advising that Plaintiff had still failed to provide verification of its actual sales for the last three months and a summary of its actual sales separated into the five specific categories.  (Dkts. 64 ¶ 39; 70-1 ¶ 40.)

Plaintiff requested administrative review.  (Dkts. 61-1 ¶ 51; 69 ¶ 51; 70-2 ¶ 57; 74 ¶ 57.)  The ARO acknowledged the request and advised that Plaintiff would remain SNAP authorized during the review process.  (Dkts. 61-1 ¶ 52; 69 ¶ 52; 70-2 ¶ 58; 74 ¶ 58.)  In a letter dated April 26, 2019, Plaintiff's counsel submitted argument and additional documents for review.  (Dkts. 61-1 ¶ 53; 69 ¶ 53; 64 ¶ 41; 70-1 ¶ 42; 70-2 ¶ 59; 74 ¶ 59.)  Plaintiff said "FNS withdrew T&K SNAP authorization because it failed to submit records that do not exist, have never existed, and that it was never required to create or maintain under federal or state laws or regulations or any FNS guidance or policy."  (Dkt. 14-11 at 2.)  Plaintiff advised that it did not maintain any reports that would identify sales in

the five categories specified in the request for records, but again proffered Mr. Nash's estimates.  (Dkts. 61-1 ¶ 55; 69 ¶ 55; 14-11 at 8–9.)

On May 7, 2019, the ARO issued its FAD, sustaining the ROD's decision to withdraw Plaintiff's SNAP authorization.  (Dkts. 61-1 ¶ 56; 69 ¶ 56; 64 ¶ 42; 70-1 ¶ 43; 70-2 ¶ 62; 74 ¶ 62.)  The FAD identified the issue accepted for review as whether the ROD took appropriate action, consistent with 7 C.F.R. Part 278, in its administration of SNAP when it withdrew Plaintiff's authorization.  (Dkts. 61-1 ¶ 57; 69 ¶ 57; 70-2 ¶ 63; 74 ¶ 63.)  The ARO made clear the purpose of the administrative review was not to determine Plaintiff's eligibility, but instead to "determine whether or not [Plaintiff] failed to cooperate with the reauthorization process, which is the reason for the withdrawal decision."  (Dkts. 61-1 ¶ 58; 69 ¶ 58; 70-2 ¶ 64; 74 ¶ 64.)  The ARO explain that "failure to cooperate" means the firm "did not submit sufficient information to enable the [ROD] to make an eligibility determination. It does not imply that the firm was unwilling to provide requested information."  (Dkts. 61-1 ¶ 59; 69 ¶ 59; 70-2 ¶ 65; 74 ¶ 65.)  The ARO concluded that "contentions and evidence presented by [Plaintiff] were not sufficient to prove that the withdrawal decision made by the [ROD] was inaccurate or that it should

be reversed," and that "[i]t remains unclear whether the firm is primarily a restaurant or a retail food store."  (Dkts. 61-1 ¶ 61; 69 ¶ 61; 70-2 ¶ 67; 74 ¶ 67.)  The ARO advised the withdrawal has no minimum duration period and a new application may be submitted at any time.  (Dkts. 61-1 ¶ 62; 69 ¶ 62; 70-2 ¶ 68; 74 ¶ 68.)

## II.   Legal Standard

Federal Rule of Civil Procedure 56 provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is material if it "might affect the outcome of the suit under the governing law."  *W. Grp. Nurseries, Inc. v. Ergas*, 167 F.3d 1354, 1360 (11th Cir. 1999) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.* at 1361 (citing *Anderson*, 477 U.S. at 248).

The party moving for summary judgment bears the initial burden of showing the court, by reference to materials in the record, that there is no genuine dispute as to any material fact.  *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1260 (11th Cir. 2004) (citing *Celotex Corp.*

*v. Catrett*, 477 U.S. 317, 323 (1986)).  The nonmoving party then has the burden of showing that summary judgment is improper by coming forward with "specific facts" showing there is a genuine dispute for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citing Fed. R. Civ. P. 56(e)).  Ultimately, there is no "genuine issue for trial" when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party."  *Id.* (citing *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).  A district court must "resolve all reasonable doubts about the facts in favor of the non-movant[] and draw all justifiable inferences in his or her favor." *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993) (alteration adopted) (quoting *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437 (11th Cir. 1991)).

## III. Discussion

Where, as here, a plaintiff seeks judicial review of an administrative decision, the district court must undertake the review de novo.  *See* 7 U.S.C. § 2023(a)(15) ("The suit in the United States district court or State court shall be a trial de novo by the court in which the court shall determine the validity of the questioned administrative action in

issue."). "If the court determines that such administrative action is invalid, it shall enter such judgment or order as it determines is in accordance with the law and the evidence." *Id.* § 2023(a)(16). The district court "reexamine[s] the agency's decision on a fresh record, rather than determining whether the administrative decision was supported by substantial evidence." *Ibrahim v. U.S. Through Dep't of Agric.*, 834 F.2d 52, 53 (2d Cir. 1987). "[T]he court must reach its own factual and legal conclusions based on the preponderance of the evidence, and should not limit its consideration to matters previously appraised in the administrative proceedings." *Modica v. United States*, 518 F.2d 374, 376 (5th Cir. 1975) (citing *Redmond v. United States*, 507 F.2d 1007, 1011 (5th Cir. 1975)).[11] "[T]he statutory requirement of a trial *de novo* 'is compatible with a summary judgment disposition if there are no material facts in dispute.'" *Affum v. United States*, 566 F.3d 1150, 1160 (D.C. Cir. 2009) (quoting *Freedman v. USDA*, 926 F.2d 252, 261 (3d 1991)). In undertaking this inquiry, the burden of proof is "placed upon the store owner to prove by a preponderance of the evidence that the violations did

---

[11] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

not occur." *Kim v. United States*, 121 F.3d 1269, 1272 (9th Cir. 1997). "The agency action prevails, unless the store proves that it should be set aside." *Goodman v. United States*, 518 F.2d 505, 507 (5th Cir. 1975). The "violation" here was failure to cooperate with the reauthorization process. (Dkt. 14-11 at 133.)

Unlike the standard of review for the underlying violation, "judicial review of the agency's choice of penalty is focused on whether the Secretary has abused his discretion." *Affum*, 566 F.3d at 1162; *see also Goodman*, 518 F.2d at 511–12. "Under the applicable standard of review, the Secretary abuses his [or her] discretion in his [or her] choice of penalty if his [or her] decision is either 'unwarranted in law' or 'without justification in fact,' or is 'arbitrary' or 'capricious.'" *Affum*, 556 F.3d at 1161 (internal citations omitted).

### A.   Defendant's Motion

Defendant contends Plaintiff's claim fails on the merits because "[i]t cannot be seriously disputed that the documents [Plaintiff] provided to FNS were insufficient to establish that [Plaintiff] was qualified for reauthorization." (Dkt. 61-2 at 16–24.) And Plaintiff's failure to provide such sufficient evidence is a failure to cooperate, requiring withdrawal.

16

(*Id.* at 22.)  Defendant argues Plaintiff cannot prove FNS's determination is erroneous, so "the violation finding—that [Plaintiff] failed to cooperate in the reauthorization review process by failing to provide the agency sufficient records to permit it to determine whether [Plaintiff] is qualified—cannot be overturned."  (*Id.* at 24.)  Plaintiff contends Defendant's motion should be denied because it is premised on the incorrect foundation—the Court's analysis concerns whether Plaintiff failed to comply with the reauthorization process, not whether Plaintiff meets SNAP eligibility requirements—and Plaintiff submitted all records in its possession that were responsive to FNS's request for records.  (Dkt. 67 at 2–3.)

In the FAD, the ARO stated that "in this case the term 'failed to cooperate' simply denotes that [Plaintiff] did not submit sufficient information to enable the [ROD] to make an eligibility determination." (Dkts. 14-11 t 133; 61-1 ¶ 59; 69 ¶ 59; 70-2 ¶ 65; 74 ¶ 65.)  The term does not imply Plaintiff "was unwilling or reluctant to provide the requested information."  (Dkt. 14-11 at 133.)  The Court must determine whether this interpretation is entitled to deference.  A district court affords an agency "no deference . . . if the language of the regulation is

unambiguous, for doing so would 'permit the agency, under the guise of interpreting a regulation, to create *de facto* a new regulation.'" *Summit Petroleum Corp. v. Env'l Prot. Agency*, 690 F.3d 733, 740 (6th Cir. 2012) (quoting *Christensen v. Harris Cnty.*, 529 U.S. 576, 588 (2000)).  "[B]efore concluding that a rule is genuinely ambiguous, a court must exhaust all the traditional tools of construction." *Kisor v. Wilkie*, --- U.S. ----, 139 S. Ct. 2400, 2415 (2019).  "A court must carefully consider the text, structure, history, and purpose of a regulation," in all the ways it would if it had no agency to fall back on.  *Id.* at 2404.

Construing regulations "is a holistic endeavor, and at a minimum must account for [a regulation's] full text, language as well as punctuation, structure, and subject matter."  *U.S. Nat. Bank of Oregon v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 455 (1993) (internal citation omitted).  Section 278.1(n) states:

> **Periodic reauthorization.** At the request of FNS a retail food store or wholesale food concern will be required to undergo a periodic reauthorization determination by updating any or all of the information on the firm's application form. Failure to cooperate in the reauthorization process will result in withdrawal of the firm's approval to participate in the program.

7 C.F.R. § 278.1(n).  "As with any question of statutory interpretation, we begin by examining the text of the statute to determine whether its meaning is clear." *Animal Legal Def. Fund v. U.S. Dep't of Agric.*, 789 F.3d 1206, 1215 (11th Cir. 2015).  Neither the Food and Nutrition Act of 2008 nor FNS's SNAP regulations define "cooperate" or "failure to cooperate."  Because they are not defined in the statute, they "must be given their ordinary or common, everyday meanings." *United States v. Caniff*, 955 F.3d 1183, 1187–88 (11th Cir. 2020); *see Animal Legal Def. Fund*, 789 F.3d at 1216 ("In the absence of a statutory definition, we look to the common usage of words for their meaning.").  "To determine the ordinary meaning of a term, courts often turn to dictionary definitions for guidance." *Castillo v. U.S. Atty. Gen.*, 756 F.3d 1268, 1273 (11th Cir. 2014).  Cooperate is defined as "to act or work with another or others [or] act together or in compliance." *Cooperate*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/cooperate; *see also Cooperate*, Oxford English Dictionary, https://www.oxfordlearnersdictionaries.com/us/definition/english/cooperate ("[T]o be helpful by doing what somebody asks you to do.").

"Whether a statutory term is unambiguous, however, does not turn solely on dictionary definitions of its component words." *Animal Legal Def. Fund*, 789 F.3d at 1216.  Rather, "[t]he plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Id.*  "In expounding a statute, we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy." *Id.*  Dictionary definitions of "cooperate" seem to focus on an entity complying with a specific request.  It appears that to cooperate, an entity must do what somebody asks it to do.  Here, Plaintiff was asked to provide records in the reauthorization process.  Under section 278.1(b), an applicant must "provide sufficient data and information on the nature and scope of the firm's business for FNS to determine whether the applicant's participation will further the purposes of the program."  7 C.F.R. § 278.1(b).  Reading the regulations as a whole, as the Court must, it is unambiguous—to cooperate, Plaintiff must provide sufficient information for FNS to determine Plaintiff's eligibility under the

program.  That is exactly the standard the ARO applied.  (Dkts. 61-1 ¶ 59;
69 ¶ 59; 70-2 ¶ 65; 74 ¶ 65, 14-11 at 133.)

The Court now must determine whether Plaintiff provided
sufficient information to have cooperated.  The undisputed facts show it
did not.  In its November 16, 2017 letter, FNS requested

- Verification of total gross sales for the last 3 months (sales tax records, income tax records, or other records verifying gross sales income)

- Verification of actual sales for the last three months (actual sales receipts, etc.)

- A summary of actual sales for the last 3 months . . . separated in the following categories: 1) heated or prepared foods, 2) non-foods, 3) accessory foods, 4) staple foods, and 5) charges for food heating services

- Supply and inventory records (purchase orders, delivery receipts for suppliers/wholesalers, inventory logs, etc.)

- All business licenses for this location (for example, health, liquor, cigarette, sales tax, etc.)

(Dkt. 14-4 at 74.)  While all of these requests were part of FNS's review,
the third request stands out, particularly in the light of FNS's announced
concern that Plaintiff was "operating primarily as a restaurant, in that
more than 50 percent of [its] food sales are hot food (heated by [Plaintiff]
before or after purchase) and/or cold prepared food."  (Dkt. 14-4 at 74.)

Plaintiff's responses included no information showing the percentage of its sales of heated or prepared food. As part of its production, Plaintiff provided its so-called "menu mix report" but explained "it does not differentiate between foods sold cold or hot and does not identify foods sold cold that are heated or cooked post sale." (Dkt. 14-5 at 102.) In regards to the third bullet, Plaintiff acknowledged FNS's request for information about the total dollar amount of sales that fell within the five categories, including heated or prepared food, but said it "does not maintain any reports that would identify sales in these categories." (*Id.*) Plaintiff ended its response with another acknowledgment that "it has no ability to retrospectively determine the precise dollar value of sales of foods heated pre-sale or post-sale," but its owner, Kason Nash, believes less than 40% of its sales fell into that category. (*Id.* at 103.)[12] During the course of this litigation, Plaintiff has

---

[12] After the receipt of FSN's December 18, 2017 letter advising Plaintiff it was withdrawing Plaintiff's SNAP authorization, Plaintiff filed a declaration from Mr. Nash stating that "[w]ell under 50% of [Plaintiff's] sales are foods that are cooked or heated pre-sale or post-sale." (Dkt. 14-6 at 55.) At another point in the response, Plaintiff's owner estimated that 35% of its sales fell into this category. (Dkt. 15-5 at 102.)

admitted his estimate was simply a "guesstimate," unsupported by any documentation.  (Dkts. 72 at 12; 14-6 at 55.)

Plaintiff repeatedly and clearly conceded it could not produce records verifying its total sales of foods cooked or heated by Plaintiff either just before or just after the sale.   In response, Plaintiff argues—as it did before the ROD and ARO—that regulations do not require SNAP retailers to maintain register receipts.  That is true.  And FNS never required Plaintiff to produce register receipts.  It also did not withdraw Plaintiff from the program for failing to produce receipts.  Rather, FNS simply required Plaintiff to provide sufficient data and information on the nature and scope of its business so FNS could determine whether the applicant's participation would further the purposes of SNAP.  As part of this, it was required to produce information sufficient for FNS to determine whether Plaintiff's sales of food cooked or heated just before or just after the sale exceeded the Restaurant Threshold.  That was no odd or unnecessary request.   It went to the heart of FNS's concern following its on-site visit.

This also was not unfair to Plaintiff.  The implementing regulations clearly place the burden on Plaintiff (and other participants) to provide

information that "will determine whether such an applicant qualifies or continues to qualify for authorization under the program." 7 C.F.R. § 278.1(a). The regulations also clearly notified Plaintiff that FNS might request such records as part of its re-verification process. *See* 7 C.F.R. § 278.1(b). It was up to Plaintiff to decide what records to create and keep in order to continue participation in SNAP. But he was required to satisfy FNS's need for information and cannot demand that FNS accept its guestimates as sufficient. Likewise, the Court rejects Plaintiff's contention that—so long as it produced whatever information it had— Plaintiff is deemed to have cooperated with FNS regardless of how admittedly inadequate Plaintiff's production was in allowing FNS to determine whether Plaintiff operated as a restaurant.

Because Plaintiff has failed to meet its burden of showing by a preponderance of the evidence that the agency decision should be overturned and that there are questions of material fact, the Court grants Defendant's motion for summary judgment.

## B.    Plaintiff's Motion

Plaintiff moves for summary judgment contending it did not fail to cooperate with FNS's request for records because it submitted all

24

responsive records in its possession and those records established it was a retail food store.  (Dkt. 63-1 at 12, 20.)  At issue—again—is FNS's request for sales information for the five categories, including food cooked on-site before or after the sale.  (Dkts. 64 ¶ 39; 70-1 ¶ 40.)  As already explained, a firm seeking reauthorization must "provide sufficient data and information on the nature and scope of the firm's business for FNS to determine whether the applicant's participation will further the purposes of the program."  7 C.F.R. § 278.1(b).  Here, that included providing information sufficient to allay FNS's concern that Plaintiff's sales exceeded the Restaurant Threshold limitations.  *Id*. at 278.1(b)(1)(iv).  During the reauthorization Plaintiff admitted it could not produce those records.  And Plaintiff cannot sidestep application of this important SNAP regulation by simply saying it gave FNS whatever it had.  As there is no dispute Plaintiff failed to provide the requested information, the Court denies Plaintiff's motion for summary judgment.

## IV.   Conclusion

The Court **GRANTS** Defendant's Motion for Summary Judgment. (Dkt. 61.)

The Court **DENIES** Plaintiff's Motion for Summary Judgment. (Dkt. 63.)

**SO ORDERED** this 22nd day of March, 2022.

_____
MICHAEL L. BROWN
UNITED STATES DISTRICT JUDGE